UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

D/F

---------------------------------------------------------------------X

FEMALE PORT AUTHORITY OFFICER 47708,

Plaintiff,

-against-

**MEMORANDUM & ORDER**
**15-CV-6359 (NGG)**

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, et al.,

Defendant.

---------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Female Port Authority Officer 47708 brings this action against Defendant the

Port Authority of New York and New Jersey (the "Port Authority") and various individuals

associated with the Port Authority: Defendants Chairman John Degnan, Vice Chair Scott

Rechler, Superintendent Michael Fedorko, Police Officer ("PO") Michael Tanis, and PO

Matthew Smith. (Compl. (Dkt. 1).) Among other things, Plaintiff seeks to recover for sexual

harassment in connection with an alleged sexual assault, and for employment discrimination

(based on her sex) in connection with the termination of her employment. (Id.) Defendants

Rechler, Tanis, and Smith have been dismissed from the action (Dec. 21, 2016, Jan. 30, 2017,

and May 2, 2017, Stipulations & Orders of Dismissal (Dkts. 67, 76, 94)), and the defendants who

remain in the action—Defendants Port Authority, Degnan, and Fedorko (collectively,

"Defendants")—have had some of the claims against them dismissed (May 5, 2017, Stipulation

& Order of Dismissal (Dkt. 100)). Plaintiff's remaining claims are the following: Sexual

harassment and employment discrimination pursuant to Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e et seq., and sexual harassment and employment discrimination

pursuant to 42 U.S.C. § 1983. (Compl.)

1

Defendants now move for summary judgment on all of the remaining claims. (Def. Mot. for Summ. J. ("Mot.") (Dkt. 107); see Def. Mem. in Supp. of Mot. ("Def. Mem.") (Dkt. 110).) For the reasons that follow, Defendants' motion for summary judgment is GRANTED IN FULL.

## I. BACKGROUND

### A. Facts

The following facts are taken from Plaintiff's statement of undisputed facts submitted pursuant to Local Rule 56.1 (Pl. R. 56.1 Statement ("Pl. 56.1") (Dkt. 111)) and from Plaintiff's memorandum in opposition to Defendant's motion for summary judgment ("Plaintiff's brief") (Pl. Mem. in Opp'n to Mot. ("Pl. Opp'n") (Dkt. 113)). Plaintiff Female Port Authority Officer 47708[1] graduated from the Port Authority of New York and New Jersey Police Departments' 113th Police Recruit Class on August 22, 2014, obtaining the title of Probationary Police Officer ("PPO"). (Pl. Opp'n at 1.) The following day, there was a graduation party arranged by the PPOs for the graduating class and their academy instructors at Zeppelin Hall Biergarten and Restaurant ("Beer Garden") in Jersey City, New Jersey. (Id.) Later that night, there was an after-party at Texas Arizona Bar and Grill ("Texas Arizona") in Hoboken, New Jersey. (Id.) At Texas Arizona, various incidents of misconduct took place, including drunken and disorderly behavior; inappropriate touching of female bar patrons and staff by male PPOs; beer being stolen; and, nearby, two PPOs and their friends jumped PATH turnstiles. (Pl. 56.1 at 8, 25, 26.) Because of the PPOs' rowdy behavior, the owner of Texas Arizona texted a friend, Sergeant Steven Cottrell of the Port Authority Police Emergency Service Unit ("ESU"), and requested assistance. (Id. at 26.) Sergeant Cottrell arrived and eventually dispersed the crowd. Sergeant

---

[1] Plaintiff has not objected to her name, Kathleen Howard, being used in court. Plaintiff was also a party to a lawsuit in the United States District Court for the Southern District of New York that is based on claims arising from the same incident, and which is filed under her real name.

Cottrell notified Lieutenant Timothy McGovern of the Police Integrity Unit ("PIU") about misconduct that the Texas Arizona owner had reported to Sergeant Cottrell. (Id.) The events at Texas Arizona also made it into various local media outlets. (Pl. Opp'n at 2.)

Plaintiff did not engage in any misconduct at Texas Arizona. (Id. at 2.) After Plaintiff left Texas Arizona, PO Michael Tanis, Plaintiff's former academy instructor and firing-range instructor, brought her back to a hotel room that he was sharing with PO Matthew Smith, another academy instructor. (Id.) When they arrived at the hotel room, Smith was having sexual intercourse with another female PPO. (Id.) Although Plaintiff told Tanis that she just wanted to go to sleep and went to a separate couch, "Tanis followed Plaintiff to that area of the room and [the] two engaged in sexual intercourse." (Id.) Plaintiff alleges that, later that night, Smith "pinned the Plaintiff against the wall, and forced his fingers inside Plaintiff's vagina." (Id. at 2.) Plaintiff did not make any formal complaint or inform anyone at PIU of her alleged assault until considerably later—after her eventual termination. (Pl. 56.1 at 12-13.)

After PIU received notification of the alleged misconduct at Texas Arizona, PIU conducted an investigation into the events that had occurred there. (Pl. Opp'n at 2.) This included interviewing 95 PPOs and 11 academy staff who were present at Texas Arizona on the night of the incident, as well as the owner of Texas Arizona. (Id. at 3.) Additionally, PIU reviewed social media obtained from a number of PPOs present at Texas Arizona that night, and available video recordings from inside and outside Texas Arizona. (Id.) During Plaintiff's interview with PIU, Plaintiff responded "I do not recall" to many of the questions addressed to her. (Pl. 56.1 at 15, 18.)

On October 20, 2014, at the conclusion of PIU's investigation, Acting Inspector General Michael Nestor provided Chief Security Officer Joseph Dunne with a 17-page confidential

memorandum (the "IG Report") outlining PIU's findings regarding the Texas Arizona incident. (Id. at 21.) Nestor provided a copy of the IG Report to Executive Director Patrick Foye and to Defendants Degnan, Rechler, and Fedorko. (Id.) On the last page of the report, a section lists the names of all of the PPOs whom PIU found to have committed misconduct. (Id. at 27.) Although Plaintiff is mentioned in the IG Report, Plaintiff's name does not appear on this list at the end. (Id. at 22.) A total of nine PPOs were terminated as a result of the investigation, including Plaintiff, but Plaintiff is the only PPO to be terminated whose name is not on this list. (Id. at 23.) Defendants state, however, that the omission of Plaintiff's name from the list was inadvertent. In addition, Plaintiff is also the only PPO to be terminated who was not found by PIU to have committed misconduct at Texas Arizona.[2] Defendants state that this is because Plaintiff's conduct during her interview was more egregious than that of any other PPO. PPO Ryan Quirk and PPO Thomas Small, however, both male, are listed at the end of the Report as "Failed to be truthful to PIU." (IG Report (Dkt. 109-5) at 17.) Both of them were only suspended for thirty days, and they had their probationary periods extended for one year. (Pl. Opp'n at 3.) Male PPO Liam Huczko, who was mentioned in the IG Report but not included on the list at the end, was not disciplined at all. (Id.)

## B. Procedural History

On April 29, 2015, Plaintiff filed a complaint with the EEOC, which was received on May 4, 2015. (Pl. EEOC Letter (Dkt. 109-26).) On November 5, 2015, Plaintiff filed her complaint in this court (the "complaint"). (Compl.) In her complaint, Plaintiff brought actions against the Port Authority, Degnan, Rechler, Fedorko, Tanis, and Smith. (Id.) The complaint

---

[2] PPO Marilyn Rey, the only other female PPO to be terminated, was only listed on the IG Report's list as "Failed to be truthful to PIU." However, the Report mentions that Rey was seen assaulting a civilian at Texas Arizona. (IG Report.)

alleged violations of Title VII, New York City Human Rights laws, New York State Human Rights laws, and 28 U.S.C. §§ 1983, 1985, and 1986. (Compl. ¶¶ 59-97.) Plaintiff stipulated to a dismissal with prejudice of the claims against Tanis and Smith on December 21, 2016, and January 27, 2017, respectively, and Plaintiff stipulated to a dismissal without prejudice of the claims against Rechler on May 1, 2017. (Stipulations & Orders of Dismissal.) Plaintiff further stipulated to a dismissal with prejudice of the claims made against the remaining defendants—the Port Authority Police Department, Degnan, and Fedorko (collectively, "Defendants")—under New York City laws, under New York State laws, and under 42 U.S.C. §§ 1985 and 1986. (May 5, 2017, Stipulation & Order of Dismissal.)

Defendants now move for summary judgment on the remaining claims: Title VII sexual harassment, § 1983 sexual harassment, Title VII employment discrimination, and § 1983 employment discrimination.

## II.  LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court does not decide questions of fact; it only determines whether such questions exist. "In evaluating a motion for summary judgment, the court 'is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor.'" Tillman v. Luray's Travel, 137 F. Supp. 3d 315, 325 (E.D.N.Y. 2015) (citing Trammell v. Keane, 338

F.3d 155, 161 (2d Cir. 2003)); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## III. DISCUSSION

There are four remaining claims: (1) sexual harassment pursuant to Title VII, (2) sexual harassment pursuant to § 1983, (3) employment discrimination pursuant to Title VII, and (4) employment discrimination pursuant to § 1983. For the reasons set forth below, Defendants are entitled to summary judgment on all four claims.

### A. Title VII Sexual Harassment

Defendants correctly argue that the Title VII claims based on sexual harassment are time barred. "As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003). The filing must take place within 180 days. Id. Here, more than 180 days passed from the time of the alleged sexual harassment on August 23, 2014, and the filing of the EEOC complaint on May 4, 2015. Therefore, the Title VII sexual harassment claims must be dismissed. See Dezaio v. Port Auth. of New York & New Jersey, 205 F.3d 62, 66 (2d Cir. 2000) ("We conclude therefore that plaintiff is not entitled to assert an ADEA claim against the Port Authority because he failed to file a charge with the EEOC within 180 days after the alleged unlawful practice occurred.").

### B. Section 1983 Sexual Harassment

In the complaint, Plaintiff's fourth cause of action claims § 1983 violations by individual defendants Tanis and Smith based on sexual harassment, and violations by the Port Authority for promoting policies that permit such harassment. (Compl. ¶¶ 80-87.) The individual defendants who committed or witnessed the alleged harassment have been dismissed from the case. As

explained below, the claim against the Port Authority is not supported by any evidence of a Port Authority policy permissive of harassment.

"[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (citing Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 98 (1978)). Here, Plaintiff argues that the Port Authority is responsible for the acts committed by the individual defendants. (Compl. ¶ 83; Pl. Opp'n at 11-12.) However, "a city may not be held liable for the actions of its employees or agents under a theory of respondeat superior . . . ; it is liable only when its policy or custom inflicts the injury upon the plaintiff." Batista, 702 F.2d at 397 (citing Monell, 436 U.S. at 694). Plaintiff has failed to produce any evidence tending to show that her dismissal or alleged harassment were the result of an official policy or custom. See id. ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, Monell prohibits a finding of liability against the City.").

Thus, Plaintiff's § 1983 claim based on sexual harassment against the Port Authority is dismissed, and, because Plaintiff's other § 1983 claims based on sexual harassment were against defendants that have been dismissed from the action, none of Plaintiff's § 1983 claims based on sexual harassment will proceed.

## C.    Title VII Employment Discrimination

Defendants correctly argue that Title VII claims cannot be made against private parties, and thus, in this case, Title VII claims can only be made against the Port Authority itself. See Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) ("The district court also properly

7

dismissed the Title VII claims against [individual defendants], because individuals are not subject to liability under Title VII."). This is true even where the individual defendants have supervisory control. See Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995) ("We now hold that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII."). Thus, the Title VII employment-discrimination claims against Degnan and Fedorko are dismissed, and the following analysis of Title VII employment discrimination only pertains to the claim against the Port Authority.

1.    Title VII employment discrimination: the law

a.    *The burden-shifting framework*

In analyzing Title VII employment-discrimination claims, courts use the now-familiar burden-shifting formula first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, a plaintiff must first demonstrate a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. If the plaintiff succeeds in this endeavor, the burden shifts to the defendant to articulate (but not prove), via admissible evidence, a legitimate reason for the employment decision. See, e.g., Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001). Finally, if the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that the articulated justification was in fact a mere pretext for discrimination. Id. at 469. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). This standard of burden-shifting was further clarified by the Court in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

To make out the prima facie case of discriminatory termination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified to perform the job in question; (3) she suffered an adverse employment action; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. See Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008); Tillman, 137 F. Supp. 3d at 325. "The burden of establishing a prima facie case of disparate treatment is not onerous." Burdine, 450 U.S. at 253. "[The Second Circuit] has repeatedly warned that the pleading requirements in discrimination cases are very lenient, even de minimis." Deravin, 335 F.3d at 200 (citation omitted). "It is a burden of production, not persuasion, and involves no credibility assessments." Rosenberg v. Chesapeake Pharm. & Health Care Packaging, 888 F. Supp. 2d 302, 309 (E.D.N.Y. 2012) (citing Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 144 (2000)).

If a plaintiff successfully presents a prima facie case of discrimination under Title VII, "the burden of production then shifts to the defendant who must proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (citing McDonnell Douglas, 411 U.S. at 802). The defendant's burden at this stage is also "light." Id. "The [defendant] need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." Id. (emphasis in original).

Finally, if the defendant provides a legitimate, non-discriminatory reason for the employment decision, the rebuttable presumption falls away "and the plaintiff must show that the adverse employment decision more likely than not was motivated in whole or part by

9

discriminatory reasons." Williams v. Mount Sinai Med. Ctr., 859 F. Supp. 2d 625, 637

(S.D.N.Y. 2012) (citing Reeves, 530 U.S. at 142-43).

> The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Burdine, 450 U.S. at 256.

### b. *Whether there must be evidence of discriminatory intent*

In the years following Burdine, the circuit courts disagreed about whether a plaintiff's

prima facie case combined with a showing that the defendant's proffered reason was pretextual

mandated a ruling for the plaintiff as a matter of law. Hicks, 509 U.S. at 512-513 (listing cases

with different holdings on the issue).

In Hicks, the Eighth Circuit had held that if a plaintiff makes a prima facie case, and the

fact-finder determines that the defendant's proffered reason was pretextual, court must give

judgment to the plaintiff as a matter of law. Id. at 511. The Supreme Court reversed. While the

Court agreed that "a rejection of the defendant's proffered reasons will permit the trier of fact to

infer the ultimate fact of intentional discrimination," it did not agree that the "rejection of the

defendant's proffered reasons compels judgment for the plaintiff." Id. (emphasis in original).

This is because it is not enough "to dis believe the employer; the factfinder must believe the

plaintiff's explanation of intentional discrimination. Id. at 519. (emphasis in original)

Hicks settled that a finding of pretext alone is insufficient to compel judgment for the

plaintiff. Id. at 511. But there continues to be a conflict among the courts of appeals "as to

whether a plaintiff's prima facie case of discrimination . . . combined with sufficient evidence for

a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." Reeves, 530 U.S. at 140 (emphasis added). In other words, the courts of appeals are conflicted as to whether a defendant is entitled to summary judgment if a plaintiff has shown a factual dispute regarding pretext, but has provided no independent evidence implying that the defendant's actions were discriminatory.

In Reeves, the Supreme Court rejected the Fifth Circuit's per se rule that a showing of pretext alone was never sufficient to create an issue for the jury. Id. at 147. On the other hand, the Court pointed out that this does not mean that such a showing will always be sufficient to withstand summary judgment. "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Id. at 148. The Court gave two examples of where summary judgment for the defendant would be inappropriate: where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Ultimately, the Court adopted a case-by-case approach:

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Id. at 148-49; see Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) ("We hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff."). <u>Reeves</u> itself did not "resolve all of the circumstances in which such factors would

entitle an employer to judgment as a matter of law." <u>Reeves</u>, 530 U.S. at 149.

After <u>Reeves</u>, lower courts continued to differ as to "what sort of a record will permit a

plaintiff who presents evidence of a prima facie case and evidence of a pretext to have a jury

consider the ultimate issue of discrimination and what sort of record will entitle a defendant to

judgment as a matter of law." <u>Zimmermann v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 381

(2d Cir. 2001). The Fifth Circuit has held that where the plaintiff has made out a <u>prima facie</u>

case and presented evidence of pretext, the case should go to the jury "in the absence of '<u>unusual</u>

<u>circumstances</u> that would prevent a rational fact-finder from concluding that the employer's

reasons for failing to promote her were discriminatory and in violation of Title VII.'" <u>Id.</u> at 381-

382 (citing <u>Blow v. City of San Antonio</u>, 236 F.3d 293, 298 (5th Cir. 2001)). "The Fourth

Circuit has observed that if the plaintiff proves a prima facie case and pretext, her claim must go

to a jury unless 'there is evidence that precludes a finding of discrimination.'" <u>Id.</u> at 382 (citing

<u>Rowe v. Marley Co.</u>, 233 F.3d 825, 830 (4th Cir. 2000).

By contrast, "[o]ur Circuit has not read <u>Reeves</u> quite so favorably to Title VII plaintiffs."

<u>Zimmermann</u>, 251 F.3d at 382. In a number of cases, the Second Circuit has held, without

insisting on special circumstances, "that a record that included evidence of a prima facie case and

evidence permitting a finding of pretext did not suffice to permit a finding of discrimination. <u>Id.</u>;

see <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 94 (2d Cir. 2001) ("[Even assuming a

jury would disbelieve defendant's reason for firing plaintiff,] the evidence presented by

[plaintiff] is not enough to permit a jury to find that the real reason he was fired was his age. We

have repeatedly held that, in the end this burden rests on the plaintiff, and, as a matter of law,

[plaintiff] has not met this ultimate burden." (internal citations omitted)); <u>Schnabel</u>, 232 F.3d at

12

91 ("We hold that summary judgment was appropriate in the case at bar, for plaintiff has presented no evidence upon which a reasonable trier of fact could base the conclusion that age was a determinative factor in defendants' decision to fire him."); James v. New York Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000) ("Because [plaintiff's] evidence was insufficient to permit a reasonable trier of fact to find that age discrimination was the reason for his discharge from NYRA, we must affirm the grant of summary judgment in defendant's favor."). "The task, as outlined in these decisions, is to examine the entire record and, in accordance with Reeves, make the case-specific assessment as to whether a finding of discrimination may reasonably be made." Zimmermann, 251 F.3d at 382.

    2.    Title VII employment discrimination: application

    a.    *Prima facie case of discrimination*

The parties agree that Plaintiff satisfies the first three elements of a prima facie case of discrimination: (1) Plaintiff is, as a woman, a member of a protected class; (2) she was qualified as a PPO; and (3) she suffered an adverse employment decision. Defendants argue, however, that Plaintiff has failed to establish a prima facie case of discrimination because, according to them, her firing did not occur "under circumstances giving rise to an inference of discrimination." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997). (Def. Mem. at 6-10.)

"This last element of a prima facie case may be proven by showing that a man similarly situated was treated differently." Id. "To be similarly situated, the individuals with whom [Plaintiff] attempts to compare herself must be similarly situated in all material respects." Id. at 64 (internal citation omitted). An employee is similarly situated to her co-employees in all material respects "if they were (1) 'subject to the same performance evaluation and discipline

13

standards' and (2) 'engaged in comparable conduct.'" Ruiz v. County of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010) (citing Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)). However, the "plaintiff is not obligated to show disparate treatment of an <u>identically</u> situated employee." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) (emphasis in original). "That an employee's conduct need not be identical to that of another for the two to be similarly situated is also reflected in the language of McDonnell Douglas, where the Supreme Court used the phrase 'comparable seriousness' to identify conduct that might help to support an inference of discrimination." Graham, 230 F.3d at 40 (citing McDonnell Douglas, 411 U.S. at 804).

The parties disagree about whether Plaintiff's comparators were similarly situated. (Def. Mem. at 10; Pl. Opp'n at 7.) While it is agreed that the other PPOs were "subject to the same performance standards" as Plaintiff, the parties dispute whether they "engaged in comparable conduct." Graham, 230 F.3d at 40. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." Id. at 39. Therefore, this dispute itself can make summary judgment at this point improper. "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). Accordingly, the court analyzes the record to determine whether a reasonable jury could find that Plaintiff and her comparators were similarly situated.

Plaintiff claims to have made a prima facie case of discrimination by pointing out that other male PPOs who engaged in similar conduct received lighter discipline and were not terminated. (Pl. Opp'n at 7-9.) Specifically, Plaintiff points to three male PPOs—Huczko, Quirk, and Small—who engaged in misconduct but were not terminated. Defendants argue that none of them engaged in misconduct as severe as Plaintiff's, and that they therefore are not

14

similarly situated. (Def. Mem. at 7-10; Def. Reply Mem. in Supp. of Mot. ("Def. Reply") (Dkt. 116) at 2-7.)

Plaintiff's assertion that Huczko was similarly situated to her is based on their both being mentioned in the IG Report discussing Port Authority employees' misconduct, and their both being omitted from the list of officers at the end of the Report ("the list") enumerating the officers found to have committed some form of misconduct. (Pl. Opp'n at 7, 8; IG Report at 16.) Plaintiff was mentioned in the IG Report as uncooperative with PIU (IG Report at 13), and Huczko is mentioned because he sent a text message to a group chat advising others to delete text messages related to the Texas Arizona party. (Pl. Opp'n at 7; IG Report at 5.)

Defendants, however, point out that Huczko, who was not even at the Texas Arizona party, told PIU investigators that he had been asked to send the text message by a superior officer. (Def. Reply at 3.) PIU accepted this explanation, and it appears that Huczko fully co-operated with PIU. (IG Report at 15.) There is no evidence that Huczko engaged in misconduct similar to that of Plaintiff, so his treatment by the Port Authority does not raise an inference of discrimination.

Both Quirk and Small, however, were found by PIU to have "failed to be truthful to PIU." (IG Report at 17.) Unlike Plaintiff, Quirk and Small each only received a 30-day suspension and an added year of probation—rather than being terminated. (Dep. of Joseph Dunne (Dkt. 109-19) at 78-79, 89.) Defendants argue that Quirk and Small received lighter discipline because, although they initially lied to PIU, "eventually they each told the truth and gave PIU the answers and information PIU requested." (Def. Reply at 4.) Quirk first told PIU that he was unaware of any misconduct by Ryan, but later admitted that he was aware that Ryan appeared to have groped a female patron at Texas Arizona. (Id.) Small deleted a text message

15

application, claiming that there had been no incriminating texts and no picture messages at all, but he recovered the messages before the end of the interview. (Id.) The recovered messages included messages about the party and a picture sent by Small of a nude woman to a group chat of PPOs. (Small Interview (Dkt. 115-4).) Small claimed that the picture had been sent to him a few months earlier, but he could not recall by whom. (Id.)

Defendants argue that Plaintiff's conduct was far more egregious than that of either Quirk or Small. (Def. Reply at 7.) "PIU had concluded that plaintiff lied and stonewalled throughout her interview." (Def. Mem. at 9.) "Plaintiff stonewalled investigations by responding 'I don't recall' or 'I don't remember' 37 times throughout her interview." (Def. Reply at 6.) Furthermore, according to Defendants, "she lied about being in the Bravo Delta chat, and about not being able to remember who told her minutes before her interview with PIU that the Fighting 113 chat was deleted." (Id.)

Nonetheless, in the court's view, a jury could find that Quirk and Small engaged in misconduct that was similar (or worse) to that of Plaintiff for three reasons. First, the IG Report states that "PPO Quirk continually lied and was deceitful to PIU investigators." (IG Report at 13.) Although he admitted to some lies during the investigation, he did this after multiple lies, and the Report ultimately concluded that he had "failed to be truthful to PIU." (Id. at 13, 17.) There is no explicit mention, however, of Plaintiff lying to PIU. Defendants' statement that "PIU had concluded that plaintiff lied and stonewalled throughout her interview," (Def. Mem. at 9), despite citing to the IG Report, is not supported by the Report itself.

> During their PIU interviews, some PPOs repeatedly stated "I don't recall," even though the interviews were conducted within one month from the night of the parties. PPO Howard stated "I don't recall" so often, that she was asked, "at the end of the evening did you walk out of Texas Arizona on your own accord?" and she responded "I don't recall." She was then asked, "were you carried out of Texas Arizona?" and she responded "I don't recall." At another point in the

> interview she indicated that just prior to her interview, another PPO advised her "Group Chat" was deleted. When asked which PPO advised her, she stated "I don't recall." When questioned with regard to being intoxicated, PPO Howard stated she had been drinking and may have felt 'buzzed" but would not consider herself intoxicated.

(IG Report at 13.) These are the only references to Plaintiff (PPO Howard) in the entire Report. Although the Report indicates that Plaintiff often responded "I don't recall," there is no "conclusion" that Plaintiff "lied throughout her interview." Quirk, on the other hand, had lied when asked specifically about the incident involving Ryan. Unlike as to Quirk, the Report did not conclude that Plaintiff had lied about specific incidents that PIU was questioning her about.

Second, the Report notes that Small admitted to deleting messages from his phone and that he indicated that "he did not believe there were any photographs associated with the text messages"—a statement that was later discovered to be a lie. (Id. at 14.) Although Small eventually recovered the deleted messages and sent them to PIU, the lie about the photographs was not discovered until after the interview. (Id.; Small Interview.) Defendants, however, point out that Plaintiff said "I don't recall" or "I don't remember" 37 times during her interview. However, in addition to noting that this number includes answers to multiple repetitions of the same questions, the court also notes that Small used similar expressions at least 30 times during his interview. Further, near the end of Small's interview, the PIU investigator, Sergeant Martinez, made it clear that he did not find Small to be cooperative:

> SGT. MARTINEZ: I'm not hearing any answers to the questions.

> MR. SMALL: There's just some things that I can't recall answers to some of the questions, sir.

> SGT. MARTINEZ: It also states that you have to be honest and accurate.

> MR. SMALL: Yes, sir.

17

SGT. MARTINEZ: Which I'm not seeing anything in this interview at all.

(Small Interview.)

Finally, regarding the assertion that Plaintiff lied about her text messages to PIU, this is not enough to significantly distinguish her from Small and Quirk. Although Plaintiff admitted during her deposition that she was on another chat, "the Bravo chat," which she did not disclose to PIU, there is no indication in the record that this was known to PIU before her termination, and she was not asked about it during her PIU interview. (See Pl. Interview (Dkt. 109-15).) Plaintiff was also not asked by PIU to retrieve the "Fighting 113" messages from her phone because, unlike Small, she claimed that the chat had been deleted by someone else. (Pl. Opp'n.) There is no evidence in the record that Plaintiff lied about this. When Martin Gleeson, general manager of the public relations unit for the Port Authority, was asked during his deposition whether there was any suspicion that Plaintiff herself had deleted the Fighting 113 chat, he responded: "This was not a major focus whatsoever in any decision concerning her discipline at all. I can tell that you categorically. It had nothing to do with that whatsoever. . . . It wasn't important to me. It wasn't important to anybody else." (Martin Gleeson Dep. (Dkt. 112-10) at 122, 123.)

Drawing all reasonable inferences in favor of Plaintiff, it would not be unreasonable for a jury to find that Plaintiff was similarly situated in all material respects to male PPOs Small and Quirk. As Probationary Police Officers, all were subject to the same performance standards. While their conduct was not "identical," a jury could find that they engaged in comparable conduct of "failing to be truthful" to PIU. See Villar v. City of New York, 135 F. Supp. 3d 105, 123 (S.D.N.Y. 2015) ("Plaintiff has also established that her termination occurred under circumstances giving rise to an inference of sex-based discrimination. The record contains

evidence that a male lieutenant subject to the same performance evaluation and discipline standards engaged in conduct comparable to Plaintiff's but received a far less harsh penalty."). Bearing in mind that Plaintiff's burden at the prima facie stage is minimal, the court's view is that Plaintiff has successfully made a prima facie showing of discrimination.

b.    *Defendant's non-discriminatory reason*

Once the plaintiff has made a prima facie case, the burden then shifts to the defendant "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254. This burden is not to persuade the court; it is sufficient "if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. . . . To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." Id. at 255. However, "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." Hicks, 509 U.S. at 509.

Here, Defendants have successfully put forward a non-discriminatory reason for terminating Plaintiff. Plaintiff was a probationary police officer who, as an at-will employee, could be terminated for any reason absent a showing of bad faith or impermissible reason. See Claudio v. Mattituck-Cutchogue Union Free Sch. Dist., 955 F. Supp. 2d 118, 127 (E.D.N.Y. 2013); Swinton v. Safir, 720 N.E.2d 89, 91 (N.Y. 1999). Defendants allege that Plaintiff was terminated because she lied to PIU investigators in violation of the rules of professional conduct. In support of this, Defendants have introduced the IG Report and the PIU interview of Plaintiff, which indicate that Plaintiff was not helpful and responded "I don't recall" enough times that a reasonable person could believe she was being dishonest. (IG Report; Dunne Dep. at 6-9, 89-91,

19

110-11; Chairman John Degnan Dep. (Dkt. 109-113) at 53-59.) Accordingly, Defendants have met their burden of producing evidence of a legitimate non-discriminatory reason for terminating Plaintiff.

        c.    *Pretext*

            i.    *Whether Defendant's reason was a pretext (generally)*

"Once the employer produces evidence of legitimate reasons for its actions, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the real reason for the adverse employment decision was discrimination." Mandell v. County of Suffolk, 316 F.3d 368, 380-81 (2d Cir. 2003). "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. The Plaintiff must now "have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." Id.

When analyzing a defendant's given reason for pretext, "we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer; the factual validity of the underlying imputation against the employee is not at issue." McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (internal quotations omitted). Thus our inquiry is not whether Plaintiff in fact lied to PIU, but whether this was the true reason for her termination. This "pretext inquiry may also involve 'factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the

allegation of discrimination.'" <u>Weiss v. JPMorgan Chase & Co.</u>, 332 F. App'x 659, 661 (2d Cir. 2009) (citing <u>DeMarco v. Holy Cross High Sch.</u>, 4 F.3d 166, 171 (2d Cir. 1993).

The court now turns to Plaintiff's proffered evidence that the Defendants' reasons for terminating her are a pretext for discrimination.

First, Plaintiff points to the evidence that she used in her <u>prima facie</u> case that similarly situated male PPOs were not fired. Thus, although terminating a probationary police officer who is dishonest to PIU "comports with the defendant's policies and rules," there is a "factual question" as to "whether the rule applied to plaintiff has been applied uniformly." <u>Id.</u> "A showing that similarly situated employees belonging to a different [protected] group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for [] discrimination." <u>Graham,</u> 230 F.3d at 43. As mentioned above, whether Plaintiff was similarly situated to male PPOs who were also found to have been dishonest to PIU is a question for the jury.

Second, Plaintiff points to the fact that her name is not listed at the end of the IG Report—where the names of those found to have committed misconduct are listed. (Pl. Opp'n at 10.) Of the employees that were terminated, Plaintiff is the only one not on that list. (IG Report at 16-17.) Furthermore, Martin Gleeson[3] stated that, after his review of the IG report and other evidence, he recommended that Plaintiff be treated in the same way as Small and Quirk—who ultimately were not terminated. (Gleeson Dep. at 172.) Together, these facts could be interpreted as indicating that the "non-discriminatory purpose was stated only after the allegation of discrimination." <u>Weiss,</u> 332 F. App'x at 661. Defendants argue, however, that the omission

---

[3] Gleeson was "assigned by the Chief Security Officer Joseph Dunne to evaluate the memorandum dated October 20th, 2014, in conjunction with the Police Integrity Unit, and to make recommendations with respect to discipline, if any, concerning the Texas Arizona incident." (Gleeson Dep. at 64.)

of Plaintiff's name from the IG Report's list was "mere oversight." (Def. Reply at 7.) Additionally, Defendants argue that Gleeson's recommendations are irrelevant since "Mr. Gleeson is a middle level manager, and by his own admission played no role in the decision on discipline made by his superiors." (Id.) Nonetheless, whether the omission of Plaintiff's name from the IG Report list was intentional or an oversight is a factual dispute, and "in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991).

      ii.    *Whether Defendant's reason was a pretext for what was actually discriminatory intent*

Assuming Plaintiff has made both a prima facie case and a showing of pretext, the court must still determine whether there is sufficient evidence for a jury to determine that the termination was discriminatory, and, as explained in Part III.B.2, supra, the Second Circuit requires more of Title VII plaintiffs than do some of its sister circuits. It is the court's view that, even if a reasonable jury could find that Defendants' non-discriminatory reason was a pretext, Plaintiff has not provided sufficient evidence to support a finding that the true reason for Plaintiff's termination was discriminatory.

"Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Reeves at 148. Accordingly we must look to "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id.

Here, Plaintiff's prima facie case, while sufficient to satisfy the initial minimal burden, is not a strong indication of discriminatory intent. Plaintiff's prima facie case rests upon the

possibility that a jury could find that similarly situated male PPOs received lighter discipline. (Pl. Opp'n at 7-9.) Even if true, there is no indication that this difference in treatment was motivated by discrimination. There is no evidence of any discriminatory remarks made. See Crump v. NBTY, Inc., 847 F. Supp. 2d 388, 394 (E.D.N.Y. 2012) (denying summary judgment because plaintiff "alleges a single, arguably racially-based remark during his termination meeting."). There is also no evidence of other women being subjected to harsher treatment than their male counterparts by the Port Authority. See Campo v. Slater, 128 F. App'x 173, 174-75 (2d Cir. 2005) (holding that although there was a prima facie case, plaintiff failed to show that gender bias was the reason for adverse employment decision because plaintiff "presented no evidence that training supervisors made disparaging comments evincing a gender bias" against men, and did not show that other males had received disparate treatment). But see Graham, 230 F.3d at 43 ("Since Title VII's principal focus is on protecting individuals, rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably.").

Even with a weak prima facie case, summary judgment might still be improper if Plaintiff's proof of pretext is "extremely substantial and the Defendant's effort to meet it is woefully inadequate." Zimmermann, 251 F.3d at 382. Here, however, Plaintiff's evidence of pretext consists only of the previously mentioned disparate treatment of one or two male PPOs, and the omission of Plaintiff's name from a list. Defendants have responded by presenting testimony that this omission was oversight, and that the reason for terminating Plaintiff was her conduct during her PIU interview. This reason is supported by the transcript of the interview itself, and by portions of the IG Report. Defendants testified that they believed Plaintiff's

conduct to be more egregious than the male PPOs because they admitted to being dishonest before the end of their interviews. Whether Plaintiff's conduct was in fact more egregious is not before the court. See Rosenberg, 888 F. Supp. 2d at 309 ("It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory."). The only relevant question is whether what motivated Defendants' decision to terminate Plaintiff was discriminatory. No evidence has been offered to indicate that the true reason was Plaintiff's sex. See Tillman, 137 F. Supp. 3d at 334 ("Ultimately, [plaintiff's] argument fails to show that discrimination was 'the real reason' for his termination." (quoting Wali v. One Source Co., 678 F. Supp. 2d 170, 182 (S.D.N.Y. 2009))); Campo, 128 F. App'x at 175 ("Indeed, [the plaintiff] offers no evidence of gender bias beyond satisfying the minimal evidentiary hurdles required to establish a prima facie case and provides few reasons to believe that the defendant's proffered nondiscriminatory rationale for the training differential was a discriminatory pretext.").

In sum, even if a reasonable jury could find that Defendants' non-discriminatory reason was a pretext, it is the court's view that Plaintiff has not provided sufficient evidence to support a finding that the true reason for Plaintiff's termination was discriminatory.

### 3. Summary

For the foregoing reasons, Defendants the Port Authority, Degnan, and Fedorko are all entitled to summary judgment on Plaintiff's Title VII employment-discrimination claims.

### D. Section 1983 Employment Discrimination

In her brief, Plaintiff argues for the first time that a § 1983 violation was committed by Defendants (i.e., the Port Authority, Degnan, and Fedorko) through employment discrimination. (Pl. Opp'n at 11-12.) Assuming, without deciding, that this argument is properly before the court, the court considers Plaintiff's § 1983 employment-discrimination claims.

24

The § 1983 employment-discrimination claims against Defendants are parallel to the Title VII employment-discrimination claims. "Once action under color of state law is established, [Plaintiff's] equal protection claim parallels [her] Title VII claim. The elements of one are generally the same as the elements of the other and the two must stand or fall together." Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) (citing Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir.1998) ("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims."); Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir.1996) ("Several circuits have held that, when § 1983 is used as a parallel remedy with Title VII in a discrimination suit . . . the elements of the substantive cause of action are the same under both statutes."). Therefore, the court's discussion in Part III.C, supra, analyzing Plaintiff's Title VII employment-discrimination claim applies to Plaintiff's § 1983 claims as well.

Thus, because, as the court explained, Defendants are entitled to summary judgment on Plaintiff's Title VII employment-discrimination claims, so too, Defendants are entitled to summary judgment on Plaintiff's § 1983 employment-discrimination claims—and so the court need not determine whether Plaintiff's § 1983 employment-discrimination argument is properly before the court.

**E.     Summary**

For the reasons discussed above, Defendants are entitled to summary judgment on each of the four remaining claims. Because no other claims remain, the granting of summary judgment to Defendants on the foregoing claims disposes of this case.

## IV. CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment (Dkt. 107) is GRANTED IN FULL. Accordingly, the Clerk of Court is respectfully directed to enter judgment for Defendants and close the case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     July 18 , 2018

NICHOLAS G. GARAUFIS
United States District Judge